# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CITY OF PROVIDENCE EMPLOYEES RETIREMENT SYSTEM, | Case No. |
| Plaintiff, | |
| vs. | |
| | DEMAND FOR JURY TRIAL |
| THE ALLSTATE CORPORATION, THOMAS J. WILSON, and MATTHEW E. WINTER, | |
| Defendants. | |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   JURISDICTION AND VENUE ......................................................................... 5

III.  PARTIES .......................................................................................................... 6

IV.  FACTUAL BACKGROUND ............................................................................ 7

     A.    Allstate's Protection Business Segment and Insurance Brands ............................ 7

          1.    Allstate's Insurance Brands ................................................. 8

          2.    Allstate's Proprietary Underwriting Practices ........................... 9

     B.    Defendants Launched an Aggressive Growth Campaign by Greatly Reducing Allstate's Underwriting Standards .......................................... 10

     C.    Allstate's Greatly Reduced Underwriting Standards Extended to Its Rollover Business ................................................................ 12

     D.    Allstate's Greatly Reduced Underwriting Standards Resulted in a Substantial Increase in Claims Frequency ........................................ 13

     E.    The Substantial Increase in Claims Frequency Caused a Large Drop in Allstate's Underwriting Income Beginning in the Fourth Quarter of 2014 ......... 17

V.    DEFENDANTS' FALSE AND MISLEADING RELEVANT PERIOD STATEMENTS .................................................................................... 18

     A.    Defendants' 2014 False and Misleading Statements ........................... 18

     B.    Defendants' February 2015 False and Misleading Statements .............. 22

     C.    Defendants' May 2015 False and Misleading Statements .................... 25

VI.  LOSS CAUSATION ...................................................................................... 30

     A.    Defendants' False and Misleading Statements Artificially Inflated the Price of Allstate Common Stock ................................................. 30

     B.    When the Market Learned the Truth, the Price of Allstate Common Stock Fell Dramatically .................................................................. 31

          1.    The February 4, 2015 Disclosure .......................................... 31

          2.    The May 5, 2015 Disclosure ............................................... 32

3. The August 3, 2015 Disclosures ............................................................ 32

C. Defendants Admit Growth Fueled by Relaxed Underwriting Standards Proximately Caused the Increase in Claims Frequency and that Allstate Will Tighten Its "Underwriting Parameters" ......................................... 33

D. Allstate Stock Price Dropped Ten Percent in a Single Day .................................. 33

E. After the August 3 Disclosure, Analysts No Longer Believed Defendants "External Factors" Explanation for the Spike in Its Claims Frequencies ............. 34

VII. POST-RELEVANT PERIOD DEVELOPMENTS ........................................................... 35

VIII. SCIENTER ........................................................................................................ 37

A. Defendant Wilson Had the Motive and Opportunity to Commit Fraud .............. 37

B. Defendants Knew Information that Contradicted Their Public Statements .......... 39

1. Issues Related to Underwriting and Claims Frequency Were Part of Allstate's Core Operations ........................................................ 40

2. Defendants Closely Monitored Underwriting and Claim Frequency and Therefore Knew of the Increasing Frequency and Its Causes .......... 41

IX. MATERIALITY .................................................................................................. 43

X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET .................................................................................................. 46

XI. CAUSES OF ACTION ......................................................................................... 47

COUNT I For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ......................................................................................... 47

COUNT II For Violation of §20(a) of the Exchange Act Against Defendants Wilson and Winter ............................................................................ 48

PRAYER FOR RELIEF ....................................................................................................... 49

JURY DEMAND ................................................................................................................. 50

Dated: September 6, 2018 .................................................................................................. 50

POMERANTZ LLP ............................................................................................................. 50

LABATON SUCHAROW LLP ............................................................................................ 50

City of Providence Employees Retirement System ("Plaintiff") alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through its attorneys, which included interviews with former employees of The Allstate Corporation ("Allstate" or the "Company"), a review of the Company's Securities and Exchange Commission ("SEC") filings, conference call transcripts and press releases; media and analyst reports about the Company; and other public information regarding the Company and the insurance industry. Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be produced through discovery.

## I.     INTRODUCTION

1.      This action is brought regarding Plaintiff's purchase of the common stock of Allstate between October 29, 2014 and August 3, 2015, inclusive (the "Relevant Period"). The claims asserted herein are alleged against Allstate, its Chairman and Chief Executive Officer Thomas J. Wilson and its President, Matthew E. Winter (collectively, "Defendants"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      This action primarily relates to Allstate's auto insurance business, the Company's largest and traditionally most profitable business unit.  It asserts that Defendants made material misstatements and omissions with respect to the proximate cause for a large spike in auto claims frequency (*i.e.*, the number of claims filed against auto insurance policies), which had a material negative impact on the Company's financial condition throughout the Relevant Period.

3.      In 2013, Defendants launched a new strategy to aggressively grow the number of Allstate insurance policies in force ("PIF") by greatly relaxing its underwriting standards. Confidential witnesses confirm that starting in 2013, the Company greatly reduced its

underwriting standards to make it far easier for agents to write new business. Another confidential witness confirms that the Company paid independent agents to roll over customers from competitor policies to Allstate policies, effectively ignoring the risk-profile of the insured driver. According to this confidential witness, Allstate was "looking to build up their volume rather than look at the risk implications of the drivers that they were taking on."

4.      As a result of Allstate's greatly reduced underwriting standards beginning in 2013, the frequency of claims paid by Allstate ***increased significantly in the third quarter of 2014***.  This increase got larger and continued until the third quarter of 2015, by which time the Company had reversed course and instituted stricter underwriting standards.

5.      Allstate closely monitors both claims frequency and the reasons for claims frequency changes, as they can have a significant impact on business decisions. For example, if a claims spike is due to an external factor, such as a rare weather event, then the Company may decide to leave its underwriting standards unchanged and recoup the losses over time. On the other hand, if a claims spike is due to loosened underwriting standards, then the Company may decide to tighten those underwriting standards to avoid unprofitable business.

6.      Monitoring trends in auto claims frequency was particularly important for Allstate's management because the Allstate brand represented 90% of the Company's auto insurance business and, as Defendant Wilson stated during a February 5, 2015 earnings call, auto insurance was its "biggest line of business."

7.      Defendants provided information to investors about changes in claims frequency on a quarterly basis, but they concealed the important fact that the Company's greatly reduced underwriting standards were the proximate cause of the spike that began in the third quarter of 2014. For example, during an earnings call on October 30, 2014 (the "October 2014 Earnings

Call"), in response to an analyst's question concerning claims frequency, Defendant Winter misleadingly responded "***our frequency so far has been extremely favorable to prior year***," and, "***frequency trends have been good***"—without disclosing that Allstate management had already identified a significant spike in claims frequency proximately caused by its reduced underwriting guidelines.

8.      Soon after the October 2014 Earnings Call, in November 2014, Defendant Wilson exercised options and ***sold $33 million*** worth of his Allstate stock (more than 85% of his shares) while the stock was trading at artificially inflated prices near all-time-highs.

9.      At an investor conference on December 9, 2014, Wilson misleadingly omitted that Allstate had not experienced an increase in claims frequency: "***So I feel good about auto insurance in general in terms of its profitability. It doesn't mean frequency won't tick up, or we won't mess up in some State, or we don't mess up in some channel.***"

10.     When asked a follow up question about claims frequency trends, Allstate's Executive Vice President and Chief Financial Officer, Steve Shebik, falsely stated, "***We haven't seen really that much. We've seen much more of an increase consistent with what you assume from the normal trends in the [Consumer Price Index].***"  Wilson and Shebik failed to inform investors that Allstate was experiencing higher claims frequency because of its reduced underwriting standards.

11.     During the Company's earnings call on February 5, 2015 (the "February 2015 Earnings Call"), Patrick Macellaro, Allstate's Vice President of Investor Relations, admitted that the Company had experienced "higher levels of accident frequency experienced in the first two months of the quarter," *i.e.*, October and November 2014.  Later, in response to an analyst's

question regarding claims frequency, Defendant Wilson admitted, "*[W]e saw a tick-up in October [2014]*."

12.     However, Defendants continued to mislead investors as to when the claims frequency increase began and as to the cause of the increase.  Defendants misleadingly attributed the increase to temporary external factors, such as the economy and the weather, rather than to their own decision to greatly reduce Allstate's underwriting standards. Winter emphatically denied that the increase was caused by "a quality of business issue or that it's being driven by growth."

13.     Thus, Defendants' false statements with respect to the cause of the increase in claims frequency misled investors into believing that Allstate's poor financial performance was only temporary and caused by external factors, not by greatly reduced underwriting standards. Nevertheless, as a result of Defendants' partial disclosure of the truth concerning the existence of the increase in claims frequency, Allstate's stock price fell 2.27%.

14.     Because the increase in claims frequency was proximately caused by Defendants greatly reducing Allstate's underwriting standards, it was *not* temporary and it continued into Q1 2015. During an earnings call on May 6, 2015 (the "May 2015 Earnings Call"), Defendants reported that Allstate's claims frequency was still elevated, but they continued to blame external factors. Winter said, "*we did a very intense deep dive into our business,*" and Wilson falsely assured investors that *"we don't see anything [in] the way we have done our business*."

15.     As a result of the partial disclosure with respect to the continued increase in claims frequency, Allstate's share price dropped 3.84%. However, based on Defendants' false assurances that the increase in claims frequency was due to external factors such as the economy

and the weather, investors continued to believe that the problem would not persist. Therefore Allstate's stock price remained artificially inflated.

16.     On August 3, 2015, Allstate shocked investors by disclosing that—not only had the purportedly temporary increase in claims frequency persisted for a third consecutive quarter—but also that the increase was proximately caused by the Company's aggressive growth, which was based on Defendants greatly reducing its underwriting standards.

17.     In response, Allstate's stock price *plummeted more than 10%* in a single day. The below chart shows the relevant declines in Allstate's stock price, which erased billions of dollars in market capitalization.



II.     **JURISDICTION AND VENUE**

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the

SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District, Allstate maintains its principal place of business in this District, and certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.

20.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

21.     Plaintiff purchased the common stock of Allstate during the Relevant Period and was damaged as the result of Defendants' wrongdoing as alleged in this Complaint.

22.     Defendant Allstate operates as a property-liability insurer in the United States and Canada. Allstate maintains its headquarters in Northbrook, Illinois. Incorporated in 1992 as a holding company for Allstate Insurance Company, Allstate is the third largest personal passenger auto insurer in the United States. Throughout the Relevant Period, Allstate stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ALL."

23.     Defendant Wilson was at all relevant times the CEO and Chairman of the Board of Allstate, and he has held those roles since 2007 and 2008, respectively. Wilson was also President of Allstate from 2005 to 2015 and has worked at Allstate for over 20 years. Wilson's director profile emphasizes his "in-depth understanding of Allstate's business," including its

products and customers, and states that Wilson "[c]reated and implemented Allstate's risk and return optimization program."

24.     Defendant Winter joined Allstate as the CEO and President of Allstate Financial in 2009. Winter served as President of Allstate Protection Lines ("APL") (which includes Allstate brand auto insurance) from 2012 to December 2014, at which time he was promoted to President of Allstate. Winter was at all relevant times "responsible for all business operations and distribution within APL."

25.     Defendants Wilson and Winter (the "Individual Defendants"), because of their positions within Allstate, possessed the power and authority to control the contents of the Company's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They had access to, and/or were provided with, copies of those Allstate reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions within Allstate, they had access to material information available to them but not to the public, such as the Company's underwriting practices (and changes thereto) and its claim frequency reports and analyses, and Defendants knew or recklessly disregarded that the material adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were, as a result, materially false and misleading.

## IV.     FACTUAL BACKGROUND

### A.     Allstate's Protection Business Segment and Insurance Brands

26.     Allstate is the largest publicly traded personal lines insurance company in the United States. Personal lines insurance includes homeowner, renter, motorcycle and auto insurance.

### 1. Allstate's Insurance Brands

27.     Allstate divides the personal lines insurance market into four groups based on consumer preferences, and then tailors insurance products for each group. Allstate differentiates between customers who want local advice and assistance versus those who are self-directed and want to purchase online. It also differentiates between customers who are brand-sensitive versus those who are brand neutral (or more price sensitive). This strategy and the brands that Allstate markets to each segment of the insurance market are illustrated by the following chart.



28.     Allstate's core business is highly concentrated in the lower left segment of the chart, where it offers Allstate branded insurance products to customers that prefer local personal advice and are brand-sensitive. In 2014, Allstate branded products accounted for **91%** of Allstate Protection segment's written premiums.

29.     Customers in this segment tend to be homeowners and have multiple vehicles, and, in general, pose lower risk and are more profitable than other types of customers. As described by Allstate, they "generally . . . want to purchase multiple products from one insurance provider including auto, homeowners, and financial products, [and] have better retention and potentially present more favorable prospects for profitability over the course of their relationship with [Allstate]." In other words, Allstate can profitably sell multiple policies to these relatively low-risk customers.

30.     Allstate brand auto insurance is sold through both exclusive Allstate agencies and independent agencies. Exclusive Allstate agencies typically sell only Allstate branded insurance products and in 2014 there were approximately 10,000 exclusive agencies in 9,800 U.S. locations. Independent agencies offer Allstate brand insurance alongside products from competitors such as State Farm, and in 2014 there were approximately 2,000 independent agencies in the U.S. that sold Allstate brand insurance.

31.     Allstate's Esurance brand is sold directly to consumers online, through contact centers, and through select agents. Encompass insurance is sold through independent agencies, predominantly in the form of bundled annual package policies.

**2.     Allstate's Proprietary Underwriting Practices**

32.     Insurance companies develop underwriting guidelines to determine whether to offer or decline insurance, as well as to determine the appropriate premiums to charge their customers. In setting and applying their underwriting guidelines, insurance companies take into account certain characteristics of the insured, such as prior driving behavior, as well as factors such as location of residence.  For example, drivers with higher accident rates or those who live in areas with heavy traffic patterns may submit more claims than other drivers. An insurance company seeking to maximize profitability will either charge such customers higher premiums or avoid insuring them.

33.     Insurance companies can increase their policies-in-force by lowering underwriting standards and can decrease the number by raising underwriting standards. When a company lowers its underwriting standards, it generally results in an increase in the number of policies-in-force, which can result in increased revenues for the company, but not necessarily increased profitability. For example, if an insurance company increases its policies-in-force by lowering its underwriting standards and selling policies to more accident prone drivers – as Allstate did in

2013, 2014 and the first half of 2015 – it could end up paying out more in claims than it collects in premiums, resulting in a net loss on those new policies.

34.     Like other insurance companies, Allstate must develop rules and practices for underwriting auto insurance policies and file these guidelines with state regulators.

35.     Importantly, however, Allstate can loosen its underwriting standards without having to change the written underwriting guidelines that it files publicly with state regulators. Allstate does this by means of a proprietary credit score known as the Insurance Financial Score ("IFS"), which Allstate uses as an input for its pricing and underwriting.

36.     A confidential witness ("CW") and former Allstate licensed insurance agent, CW 1, confirmed that Allstate uses an IFS range from 1 to 16, and added that the accepted range of insurability differed by state. According to CW 1, prior to October 2015, Allstate allowed its agents to write policies for drivers with IFS over the entire range, from 1-16, provided the driver had no major driving infractions. However, CW 1 reported, after Allstate tightened its policies in the fall of 2015, it became much more difficult to qualify customers for policies.

37.     CW 2, a former Allstate actuary assistant from June 2008 to September 2014, worked with the output of the IFS model to conduct actuarial analyses for auto insurance. According to CW 2, the IFS model was "very confidential" and was a "black box" algorithm that was not shared with anyone outside of those who developed it.

**B.      Defendants Launched an Aggressive Growth Campaign
        by Greatly Reducing Allstate's Underwriting Standards**

38.     At the start of 2013, Allstate announced to investors that it was reordering its priorities and making growth its number one goal. During an earnings call on February 7, 2013, Defendant Wilson announced that "Looking forward for 2013, our priorities are very similar to last year's *but with an increased emphasis on growth*," and the presentation that went along

with the call indicated that Allstate would reorder its five operational priorities, with growth being its new number one priority.

39.     Another confidential witness, CW 3, was a Colorado Allstate Agency owner for nearly thirty years, through October 2016. According to CW 3, *Allstate significantly loosened its underwriting guidelines in 2013 to increase the number of its policies in force*. CW 3 stated that Allstate loosened the underwriting guidelines "way too much," which allowed agents to write new policies like "gang busters." CW 3 hired more staff in 2013 to sell more policies. One of these agents broke a number of records in 2013 for selling hundreds of new policies. Because of the much lower underwriting guidelines, CW 3 stated that "the quality of the business went way down . . . and the losses increased." CW 3 also stated that, "I knew the quality of the business was going to go down and the loss ratio was going to be outrageous."

40.     CW 3 also described specific, unprecedented steps that Allstate took to loosen its underwriting guidelines in 2013, and stated that Allstate altered its IFS more than once. For one, Allstate altered its IFS algorithm to allow drivers with good credit to qualify for the best IFS score of 1, *i.e*, the most preferred base-rate, no matter how many tickets or prior accidents the drivers had. Another exception allowed certain drivers with no prior insurance to obtain Allstate insurance at preferred rates.

41.     In addition to these substantial changes to Allstate's underwriting guidelines, CW 3 stated that Allstate created an insurance score appeals department ("IS Appeals"), which allowed agents to push drivers through the underwriting process who otherwise would not have been approved for insurance. In fact, the IS Appeals process approved many drivers with no prior insurance to qualify for Allstate's lowest IFS score and most preferred rate. CW 3 stated that drivers "flew through" the system and that every driver CW 3's agency submitted to IS

- 11 -

Appeals was approved for a policy. CW 3 also stated that agents were under tremendous pressure to write new policies and that Allstate incentivized agents to push drivers through the IS Appeals process. According to CW 3, all of this new business obtained through greatly reduced underwriting standards caused a severe loss ratio in 2014.

42.     CW 3 attended district and regional meetings where Allstate's underwriters would discuss rate changes across several states.  CW 3 explained that in 2013, when Allstate underwriters loosened the underwriting guidelines, they would email this information to the agencies throughout the country.

### C.     Allstate's Greatly Reduced Underwriting Standards Extended to Its Rollover Business

43.     Allstate's efforts to increase the number of policies in force through its independent-agent channel were also problematic. Another confidential witness, CW 4, is a former Allstate employee who worked on Allstate's independent-agent side of the business. From January 2013 to November 2014, CW 4 worked as a Financial Analyst and was responsible for reporting certain metrics, including new business items, items-in-force, revenue numbers, and year-over-year growth. The information that CW 4 reported went to the Financial Protection Team, which then validated and finalized those numbers for Allstate's financial reports.  CW 4 then transitioned to a role as a senior compliance consultant in Allstate's Claims Risk Management group from November 2014 through October 2016. As a compliance officer, CW 4 managed a team of Allstate employees that monitored claim payment transactions. In both roles, CW 4 analyzed the quality of drivers Allstate insured and the frequency and severity of claims against new policies that Allstate underwrote.

44.     CW 4 stated that Allstate encouraged a practice through independent agents known as "book rollovers." A book rollover occurs when an agent rolls over a customer from a

different company, such as GEICO or Prudential, to an Allstate policy. Beginning in 2013, as part of its aggressive push to increase the number of policies in force, Allstate spent millions of dollars incentivizing independent agents to roll customers over to Allstate. As part of this practice, agents monitored when policies from other companies were set to expire and then would call policy holders to encourage them to switch to Allstate.

45.     According to CW 4, these practices were done without regard to the kinds of drivers being added to Allstate's books.  CW4 stated that Allstate was "looking to build up their volume rather than look at the risk implications of the drivers that they were taking on." When analyzing the claims from such drivers, CW 4 noted an increase in claims frequency and severity starting in 2014, and noted that "we [Allstate] created the severity with the policies we were writing." CW 4 stated that the new policies were being written for "a lot of bad drivers," and when CW 4 looked at the driving histories of drivers that had been rolled over, CW 4 was shocked to see that Allstate had insured them. CW 4 added that "people that you would never want to insure as a company because they were prone to accidents were going into these policies."

### D.     Allstate's Greatly Reduced Underwriting Standards Resulted in a Substantial Increase in Claims Frequency

46.     For years leading up to the start of the Relevant Period, Allstate's claims frequency remained mostly flat or declining. As one analyst noted in August of 2013, "[auto] frequency for the last three years has . . . been pretty much nonexistent." Just over a year later, another analyst reported that Allstate's frequency trends "remained relatively benign."

47.    Allstate's profitability metrics leading up to the Relevant Period were also stable, with the underlying combined ratio[1] for Allstate brand auto staying around 91-93 in the first three quarters of 2014.

48.    However, no later than Q3 2014, Allstate experienced a steep increase in claims paid frequency, which reversed the Company's long-standing favorable frequency and profitability trends. Specifically, from Q2 2014 to Q3 2014, Allstate experienced a jump of 4.0 percentage points in the year-to-year quarterly rate change in auto bodily injury (or "BI") paid frequency, moving from a negative 3.8% rate change to a positive 0.2% rate change. In other words, in Q2 2014, Allstate's bodily injury claims frequency trend was favorable and indicated that claims frequency was decreasing by 3.8% year-over-year; however, by Q3 2014, that trend not only had reversed but had swung in the opposite direction, and was increasing by 0.2% year-over-year.

49.    The chart below, based on data disclosed by Allstate in February 2016 in its Fourth Quarter 2015 Investor Supplement, shows changes in Allstate's auto bodily injury claims paid frequency, and illustrates how the increase in the claims paid frequency began with a 4% increase in Q3 2014, intensified in Q4 2014 and continued through Q3 2015.[2]

---

[1] "Combined ratio" refers to the sum of the loss ratio and the expense ratio. The difference between 100% and the combined ratio represents Allstate's underwriting margin.

[2] "Paid frequency rate is calculated as the number of claim notices closed with a payment amount in [a given] period divided by the average coverage in force." Fourth Quarter 2015 Investor Supplement at p. 21. Therefore, although this data was not disclosed until February 2016, it was current data that Defendants monitored at least each quarter (and, in fact, on a daily basis).



50.     Thereafter, as shown in the chart above, during Q4 2014, the increase in claims frequency only continued to accelerate. Indeed, the rate change in auto bodily injury paid frequency jumped 4.5 percentage points, from a 0.2% increase in Q3 2014 to a 4.7% increase in Q4 2014.

51.     Further, Allstate's greatly reduced underwriting standards not only affected its bodily injury paid claims, but similarly affected its property damage (or "PD") paid claims. Property damage paid claims experienced a small improvement in year-over-year rate changes in Q2 2013, but then, like bodily injury frequency, reversed course and increased in Q3 2014, and thereafter experienced sustained and steadily increasing frequency rates through Q3 2015.

52.     As set forth in the chart below (based on data disclosed by Allstate in its 2015 Fourth Quarter Supplement)[3] following several consecutive quarters of year-over-year *declines* in bodily injury claims frequency, the frequency trend began to move upward in Q3 2014 and then spiked up sharply to a 4% *increase* in Q4 2014.  That increase grew even larger over the next three quarters:



_____

[3] Unlike the data on bodily injury paid claims frequency (*see* Chart on p. 15), which was first made available in February 2016, Allstate published this received claims frequency data on a quarterly basis during the Relevant Period, and it formed the basis for many of the analysts' questions and reports referenced herein.

53.     Moreover, Defendants later ***admitted*** that they were aware of the frequency increase at least as of October 2014. Specifically, during the February 2015 Earnings Call, when analysts questioned Allstate management about claims frequency, Wilson said that Winter "has been waiting anxiously for your question, because he's spent [an] ***untold number of hours over the last really three months since we saw a tick-up in October [2014]***." Thus, it is clear that Wilson was aware of the spike in claims frequency when he sold $33 million of Allstate stock in November 2014.

### E.     The Substantial Increase in Claims Frequency Caused a Large Drop in Allstate's Underwriting Income Beginning in the Fourth Quarter of 2014

54.     The immediate impact that the increase in claims frequency had on Allstate's financial condition and operating results was significant. The Allstate brand auto underlying combined ratio (*i.e.* its total costs, not counting certain unusual events such as major catastrophes) skyrocketed to 98.2 in Q4 2014, its highest level since 2011. In other words, the profit margin became paper thin, leading to a significant reduction in underwriting income.

55.     Moreover, the increase in claims frequency and the corresponding spike in underlying ratios continued to wreak havoc on Allstate's financial condition throughout the Relevant Period, as illustrated by the following chart depicting Allstate's quarterly underwriting income for Allstate brand auto insurance (showing a steep decline in underwriting income

beginning in the fourth quarter of 2014.)



## V.    DEFENDANTS' FALSE AND MISLEADING RELEVANT PERIOD STATEMENTS

### A.    Defendants' 2014 False and Misleading Statements

*False Statement No. 1: The October 2014 Press Release; Comprehensive Plan to Generate Profitable Growth / Omission that Defendants' Greatly Reduced Allstate's Underwriting Standards Caused Claims Frequency Increase*

56.    On October 29, 2014, Defendants issued a press release reporting Allstate's Q3 2014 results (the "October 2014 Press Release"). The October 2014 Release stated, "The Allstate brand grew insurance policies in force by 572,000, or 1.9% in the third quarter of 2014 compared to the prior year quarter, *after reflecting a comprehensive plan to generate profitable growth*."

57.    That statement was materially false and misleading because Allstate had not implemented a "comprehensive plan to generate profitable growth." Rather, to implement

Defendants' aggressive growth strategy, Defendants caused Allstate to underwrite riskier and less profitable business that resulted in an increase in claims frequency, which, Defendants knew, was having a material negative impact on the Company at the time.

### False Statement No. 2: The October 2014 10-Q; Comprehensive Plan for Profitable Growth / Omission that Defendants' Greatly Reduced Allstate's Underwriting Standards Caused Claims Frequency Increase

58.     Also on October 29, 2014, Allstate filed a Form 10-Q with the SEC, which reported the Company's financial results for Q3 2014 (the "October 2014 10-Q").

59.     The October 2014 10-Q failed to disclose the increase in claims frequency to date. Having discussed the Company's "comprehensive plan to generate profitable growth" Defendants had a duty to include relevant information about how that plan was already generating higher claim frequencies for both bodily injury and property damage. In addition, Defendants failed to disclose that the increase in claims frequencies was caused by Allstate's greatly reduced underwriting standards.

### Item 303 Disclosure Required for Known Trend

60.     Defendants also had a duty to disclose a known trend in claims frequency as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303").

61.     Under Item 303, Defendants had a duty to disclose the increase in Allstate's paid claims frequency in the October 2014 10-Q, especially because the increase in frequency caused the trend to turn from negative to positive between Q2 and Q3 2014, and because that trend rapidly accelerated in October 2014. *See* ¶¶48-50, Chart on p. 15.

62.     The October 2014 10-Q should have disclosed, *inter alia*, the existence of the trend, a description of the trend, including the cause of the trend; and that the trend was reasonably expected to have a material impact on Allstate's income.

**False Statement No. 3: The October 2014 Earnings Call;
"Frequency Trends Are Favorable"**

63.     On October 30, 2014, Allstate hosted the October 2014 Earnings Call. During that

call, in response to a question from an analyst from Janney Montgomery Scott about whether

Allstate was pricing for increased frequency, Defendant Winter stated that "***our frequency so far

has been extremely favorable to prior year***," adding, "***so our frequency trends have been

good***."[4]

64.     Winter's statement was materially false and misleading because it omitted the

material fact that Allstate's decision to greatly reduce its underwriting standards had caused the

increase in claims frequency, which was already having a material negative impact on Allstate at

the time.  More specifically, Allstate's bodily injury paid claims frequency had spiked between

Q2 and Q3 from a negative 3.8% year-over-year to a positive 0.2%.  *See* Chart on p. 15.

**False Statements No. 4: The December 2014 Conference; "Tweaking"
Models, Frequency Could "Tick Up" and Blaming External Factors**

65.     On December 9, 2014, Goldman Sachs hosted an investor conference in which

Allstate management participated ("December 2014 Conference"), including Wilson and CFO

Shebik. During the conference, an audience member asked Wilson about Allstate's homeowners

and auto rates and how confident Wilson was that profitability could be maintained. Wilson

responded in part by saying "We've ***tweaked*** our models to improve retention. So if you look at

the improved retention in our auto business, we are doing a better job of spreading those rate

changes more effectively. ***So I feel good about auto insurance in general in terms of its***

---

[4] Winter further assured investors that Defendants "stay on top of" claims frequency trends and
"have a pretty long-term history of managing our margins well and keeping an eye on both
frequency and severity and reacting accordingly."  This statement shows that Defendants knew
about the increasing claims frequency.

**profitability. It doesn't mean frequency won't tick up, or we won't mess up in some State, or we don't mess up in some channel.**"

66.     These statements were materially false and misleading because Allstate had not merely "tweaked" its models, as Wilson claimed. Rather, Defendants had greatly lowered Allstate's underwriting standards in order to aggressively grow the Company's business.

67.     Moreover, Wilson's statement that it "doesn't mean frequency won't tick up" in the future was materially misleading because paid bodily injury claims frequency already increased by 4% in the third quarter of 2014, turning from negative to positive.  *See* Chart on p. 15.  Moreover, Allstate had by then experienced a sharp, 5.3%  increase in bodily injury claims frequency for the months of October and November 2014.  *See* Chart on p. 16.

68.     Immediately after Wilson's response, an audience member asked: "[W]hat's your trend in loss cost inflation? Where are you seeing more pressures on claims inflation." Shebik responded "So we've seen pretty much inflation consistent with what the indices would be. If you look at the whole industry for the course of the year, people have been having a few issues in a handful of states in terms of PIF or BI coverages. ***We haven't seen really that much. We've seen much more of an increase consistent with what you assume from the normal trends in the [Consumer Price Index]."***

69.     This statement was an affirmative misrepresentation and materially false and misleading because Shebik omitted the material fact that the increase in claims frequency was proximately caused by the Company's greatly reduced underwriting standards.  Further, his statement that "we haven't really seen that much" with regard to trends in claims frequency and severity omitted the material fact that Allstate had already experienced a sharp increase in paid

claims frequency in the third quarter of 2014 (*see* Chart at p. 15) and that the trend, which already had a material negative impact on Allstate, was accelerating in the fourth quarter.

**B.    Defendants' February 2015 False and Misleading Statements**

*False Statement No. 5: February 2015 Press Release;*
*Blaming External Factors /Omission of Greatly Reduced Underwriting*
*Standard*

70.    After the market closed on February 4, 2015, Allstate issued a press release reporting the Company's Q4 2014 and FY 2014 results ("February 2015 Press Release"). In that Press Release, Allstate first admitted that the Company's claims frequency had spiked. It stated, "An increase in claims frequency in the first two months of the quarter [October and November 2014] adversely impacted the combined ratio for auto insurance, with Allstate brand auto combined ratio rising to 97.0, [which] was 1.7 points higher than the prior year." As a result of that disclosure, Allstate stock declined by 2.27% over the next two trading days.

71.    However, the February 2015 Press Release identified only external factors as the cause of the increase in claims frequency, and specifically the "***impact of precipitation in select markets and general economic trends***."

72.    These statements were materially false and misleading because, by attributing the increase in claims frequency on "precipitation" and "general market conditions" they omitted the material fact that the Company's greatly reduced underwriting standards were a proximate cause of the increased claims frequency.

*False Statement No. 6: The February 2015 Earnings Call;*
*Blaming External Factors /Omission of Greatly Reduced Underwriting*
*Standard*

73.    The next day, February 5, 2015, Defendants hosted the February 2015 Earnings Call. During that call, Defendants continued to blame the increase in claims frequency exclusively on external factors:

(a)     When analysts questioned Defendants about claims frequency, Wilson stated, "[Winter ] has been waiting anxiously for your question, because he's spent [an] untold number of hours over the last really three months since we saw a tick-up in October. So we were on this early, and he can give you all the specifics."

(b)     Winter reassured investors by stating: "***Let me start with what is not driving it. Number one, we saw nothing to indicate that it's a quality of business issue or that it's being driven by growth, which is a natural question that you would have*** . . . ." Winter explained the analysis that Allstate had conducted and repeated that they "***saw nothing in there that would indicate it was a quality of business or a growth-related issue***." Winter attributed the spike in frequency to "***two factors [that] traditionally drive PD frequency: miles driven and precipitation***."

(c)     Winter further assured investors that the members of Allstate management closely study the issue to the point they are "paranoid," that they "get paid to worry a lot and to focus intensely" on the issue, and "***[i]n no way are we concerned that it's a quality issue***."

(d)     Signaling the importance of the issue, analysts sought to confirm yet again that the frequency increase was related solely to miles driven and weather. A Goldman Sachs analyst asked: "So there's not a third factor of why is this happening and what can we do about it that you are concerned about?" Defendant Winter responded: "***We are confident that we have analyzed this to death, some might say. We understand the drivers***." Winter again emphasized that the causes were external factors, stating that "***precipitation and employment rates are not Allstate-peculiar issues***" and "***not . . . related specifically to the Company***," but instead were "***related to the general environment***."

(e)     Macellaro acknowledged that Allstate brand auto "did experience a spike in the underlying combined ratio in the fourth quarter," and attributed the increase to "higher levels of accident frequency experienced in the first two months of the quarter," but he too claimed the frequency spike "was *driven by a combination of increased economic activity and non-catastrophe weather*."

74.     These statements were materially false and misleading by attributing the increase in claims frequency to "precipitation" and "general market conditions." They omitted the material fact that Allstate's greatly reduced underwriting standards were a proximate cause of the increased frequency.

### *Defendants' False Statements Convinced Analysts that the Claims Frequency Increase Was a One-Time Event*

75.     Analysts focused on the increase in Allstate's claims frequency, but they were misled by Defendants' repeated and emphatic assurances that the increase was externally driven. For example, analysts from Wells Fargo Securities wrote on February 5, 2015 that it was a "[f]requency blip," and that "Allstate does not think the frequency increase is associated with the quality of business being written or the greater pace of business growth."

76.     Also on February 5, 2015, Morningstar Equity Research analysts reported Allstate's fourth quarter increase in claims frequency as "a one-time event."

### *False Statement No. 7: The 2014 10-K; Blaming External Factors*

77.     On February 19, 2015, Allstate filed its Form 10-K, which reported the Company's financial results for Q4 and fiscal year 2014 (the "2014 10-K").

78.     The 2014 10-K reported on claims frequency and noted an increase in claims frequency for Q4 2014, but again attributed its causes only to external factors, including "*severe winter weather*," "*higher miles driven*" and "*higher precipitation*." This statement was

- 24 -

materially false and misleading because they omitted the material fact that Defendants' greatly

reduced underwriting standards for Allstate proximately caused an increase in claims frequency,

which was already having a material negative impact on the Company, including a steep decline

in Allstate brand quarterly underwriting income (which declined from $300 million in Q3 to

$133 million in Q4).

79.     The 2014 10-K also failed to disclose the increase in claims frequency, as

required by Item 303.

### C.     Defendants' May 2015 False and Misleading Statements

**False Statement No. 8: The May 2015 Press Release;**
**Allstate's New Business Was Not "Profitable Growth"**

80.     After the market closed on May 5, 2015, Defendants issued a press release

reporting Allstate's Q1 2015 earnings results (the "May 2015 Press Release").

81.     The May 2015 Press Release disclosed the continuation of the increase in claims

frequency. However, quoting Wilson, it further stated: "***Allstate's strategy*** of building a broad-

based business model ***continued to generate profitable growth . . . . The Allstate brand had***

***good growth and returns in auto*** . . . ."

82.     On that news, the Company's stock price dropped by 3.84% the following trading

day.

83.     This statement was materially false and misleading because it omitted the material

fact that Allstate had not "continued to generate profitable growth." Rather, Defendants' greatly

reduced underwriting standards resulted in Allstate underwriting riskier and less profitable (or

unprofitable) business that was proximately causing an increase in claims frequency, which was

having a material negative impact on the Company at the time. In fact, Allstate's quarterly

underwriting profit for the first quarter of 2015 was greatly lower than its underwriting profits had been during the seven consecutive quarters beginning with Q1 2013. *See* Chart on p. 18.

### *False Statement No. 9: The May 2015 10-Q; Blaming External Factors*

84.     That same day, Allstate filed an SEC Form 10-Q reporting the Company's financial results for Q1 2015 (the "May 2015 10-Q").

85.     The May 2015 10-Q again misattributed the cause of the increase in claims frequency to "***adverse winter weather***." That statement was materially false and misleading because it omitted the material fact that Defendants' greatly reduced underwriting standards for Allstate proximately caused the increase in claims frequency, which was already having a material negative impact on the Company.   In Q1 2015, Allstate brand quarterly underwriting income was $144 million, which was nearly a 50% drop off from the quarterly income earned by the Allstate brand for the seven consecutive quarters beginning in Q1 2013. *See* Chart on p. 18.

86.     The 2014 10-K also failed to disclose the increase in claims frequency, as required by Item 303.

### *False Statement No. 10: The May 2015 Earnings Call; Blaming External Factors*

87.     The next day, May 6, 2015, during the May 2015 Earnings Call, Macellaro reported on the increase in claims frequency, but he again assured investors that Defendants closely monitored Allstate's claims frequency trends, stating, "Based on our analysis ***we continue to be comfortable with the quality of both our new and renewal business***." Macellaro further stated that Allstate's "analysis also reinforces our conclusion that ***recent frequency fluctuations are due primarily to macroeconomic trends in weather*** and while we believe industry-wide auto frequency will continue its long-term downward slope over time, there will be periods of variability within that trend that are driven by external factors."

88.    When an analyst on the call stated he was confident Allstate could maintain auto margins, but was "less confident that you could continue to grow PIF at the current rate," and asked if management planned to take pricing actions that could "lose some PIF [growth] momentum," Wilson responded:

> [T]he first thing you have to get through: ***is this our problem or is this everybody's problem?*** If it is our problem then obviously the actions we take will be different and the impact on shareholder value and long-term value creation is different than if it's everybody's problem.
>
> If it is everybody's problem then the actions we take and the impact on both growth, profitability, customer satisfaction, ability to expand the agency is completely different. ***So we feel like this is at this point everybody's problem,*** Matt can help you understand why we believe that is the case.

Winter added:

> …. ***As we talked about last quarter actually, the frequency pressure is a combination of miles driven and weather***. And I believe I said last quarter we thought that miles driven was about three times as influential as the weather. ***That pattern seemed to hold up again this quarter***.
>
> . . . ***we did a very intense deep dive into our business to ensure that the increases in the frequency we are seeing*** are proportional and consistent across multiple segments of the business no matter how you cut it, to make sure in effect that these ***aren't our problems but are in fact external***.
>
> And so we looked at new and renewal business, we looked at higher growth states versus lower growth states. We looked across quality characteristics, we looked across driver age, household composition, insurance scores, full coverage versus liability across different rating plans to see whether or not perhaps rating plans had influenced it.
>
> ***And all of that review showed that this trend is externally driven primarily by miles driven.***
>
> \*        \*        \*

- 27 -

So we validated it with our internal data, we validated with external data and then we look[ed] at other sources to ensure that that in fact is true. . . .

\*      \*      \*

***So you look at all of that and you come to the conclusion that in fact this is an external trend.***

89.    When an analyst on the call asked why the external factors were not impacting Allstate's competitors, Wilson responded, "[W]e can't answer the question as it relates to other people." Then Wilson reassured the participants on the call by again emphasizing Allstate's visibility with respect to claim frequency trends, stating, ***"We can answer the question which Matt [Winter] talked extensively about which is we don't see anything [in] the way we have done our business. We have the ability to slice and dice our data as if we were our own competitor, right. So we can slice and dice it a whole bunch of ways and we do think it is comprehensive."***

90.    These statements were materially false and misleading because they omitted the material fact that Defendants' greatly reduced underwriting standards for Allstate were a proximate cause of the increase in claims frequency, which was already having a material negative impact on the Company's financial performance.

### Defendants' Statements Continued to Mislead Analysts and the Market

91.    Analysts and investors continued to be misled by Defendants' reassurances with respect to the increase in claims frequency. For example, a May 6, 2015 analyst report from Credit Suisse Securities Research & Analytics accepted Defendants' explanation that the problem was solely external, and thus would not impact Allstate's ability to obtain regulatory approval for planned rate increases. Therefore, they believed that any financial impact was strictly temporary. For example, the report noted that Allstate's "view is that the pickup in trend

is driven by external factors so rate increases should be easier to obtain," which made the analysts "more confident that this is not an [Allstate] specific issue," enabling the Company "to push through rate at a faster than expected pace."

92.     A May 6, 2015 analyst report from RBC Capital Markets agreed, reporting that "[w]e don't believe this phenomenon is specific to just Allstate, which should make it easier for them to take corrective pricing actions without sacrificing much policy-in-force growth." In other words, the news delivered by Allstate was considered positive.

93.     Other analysts also believed that, because the increased frequency was purportedly the result of external factors, it would not recur. For example, on May 6, 2015 MKM Partners reported "we would expect better auto results are ahead."

> **False Statement No. 11: May 2015 Sanford Conference;**
> **Denying the Existence of the Trend and Blaming "Normal Volatility"**

94.     On May 28, 2015, when Wilson presented at the Sanford C. Bernstein Strategic Decisions Conference, he was asked about the increase in claims frequency.  He responded, "***It just looks sort of benign. If you look at the normal volatility, I would say, we just had a normal volatility. I don't think it's any worse or better than any other time***."

95.     These statements were materially false and misleading because they omitted the material fact that the increase in claims frequency was not "benign" or the result of "normal volatility." Rather, Defendants' greatly reduced underwriting standards had caused Allstate to underwrite the riskier and less profitable business that was proximately causing the increase in claims frequency, which was having a material negative impact on the Company at the time.

VI.     **LOSS CAUSATION**

    A.     **Defendants' False and Misleading Statements Artificially Inflated the Price of Allstate Common Stock**

96.     During the Relevant Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Allstate common stock and operated as a fraud or deceit on Plaintiff by misrepresenting the Company's true state of affairs and prospects, and omitting to disclose the increase in frequency of auto accident claims, and that the new business growth fueled by greatly reduced underwriting standards was a proximate cause of the increase in frequency.

97.     Defendants' false and misleading statements had their intended effect and directly and proximately caused Allstate common stock to trade at artificially inflated levels, reaching a Relevant Period high of $72.58 per share.

98.     As a result of Defendants' fraudulent conduct as alleged herein, the price at which Allstate common stock traded was artificially inflated throughout the Relevant Period. When Plaintiff purchased its Allstate common stock, the true value of such common stock was greatly lower than the prices actually paid. As a result of purchasing Allstate common stock during the Relevant Period at artificially inflated prices, Plaintiff suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

99.     In addition, Defendants assured investors that the increase in frequency of auto claims was solely related to external factors and that Defendants monitored frequency daily, and at times hourly. Defendants' assurances were nothing more than a further attempt to mislead the market's expectations for the Company. To that end, Defendants' false and misleading statements maintained and increased the artificial inflation in the price of Allstate common stock.

100.     As a result of Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to the Defendants, Plaintiff relied, to its detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Allstate common stock at artificially inflated prices during the Relevant Period. Had Plaintiff known the truth, it would not have made such purchases.

### B.      When the Market Learned the Truth, the Price of Allstate Common Stock Fell Dramatically

101.     When the misrepresentations and omissions that Defendants had concealed from the market were revealed through the series of partial disclosures beginning on February 4, 2015, and continuing through the close of the market on August 4, 2015, the price of Allstate common stock fell dramatically, falling 10% on August 4 alone, and causing substantial losses to investors.

### 1.      The February 4, 2015 Disclosure

102.     After the market closed on February 4, 2015, Allstate revealed a significant increase in claims frequency (*see* Chart on p. 16), partially disclosing the negative impact of Defendants' strategy to aggressively grow Allstate's insurance business by reducing the Company's underwriting standards. As a result of the partial disclosure, Allstate's stock price dropped from a close of $72.58 per share on February 4, 2015 to a close of $70.93 per share on February 6, 2015. *See* Chart on p. 5. This decline in the price of Allstate common stock was the direct result of the nature and extent of the partial revelations made to the market. The partial removal of artificial inflation from the price of Allstate stock would have been greater had Defendants fully disclosed the truth. However, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth regarding the cause of the increase in claims frequency, the price of Allstate stock remained artificially inflated.

### 2.    The May 5, 2015 Disclosure

103.    After the market closed on May 5, 2015, Defendants revealed a second consecutive increase in claims frequency, partially disclosing the negative impact of Defendants' strategy to aggressively grow Allstate's insurance business by reducing the Company's underwriting standards. *See* Chart on p. 16, showing continuing increase in claims frequency. As a result of the disclosures of the continued increase in claims frequency, Allstate's stock price dropped from a close of $70.00 per share on May 5, 2015 to a close of $67.31 per share on May 6, 2015. *See* Chart on p. 5. This decline in the price of Allstate common stock was the direct result of the nature and extent of the partial revelations made to the market. The partial removal of artificial inflation from the price of Allstate stock would have been greater had Defendants fully disclosed the truth. However, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth regarding the cause of the increase in claims frequency, the price of Allstate stock remained artificially inflated.

### 3.    The August 3, 2015 Disclosures

104.    After the market closed on August 3, 2015, Defendants issued a release reporting Q2 2015 financial results (the "August 2015 Press Release"). In the August 2015 Press Release, Allstate shocked investors by reporting disappointing financial results that reflected the third consecutive quarter of increases in claims frequency. It reported quarterly operating income of $262 million, which was $350 million (57%) less than the prior quarter, and disappointing operating EPS of $0.63, a $0.34 (35%) shortfall from analysts' consensus. In addition, quoting Wilson, it attributed Allstate's dismal operating EPS to "increased frequency and severity of auto accidents," which also "negatively impacted" loss and combined ratios. Both bodily injury and property damage frequency increased nearly 7% on a year-over-year basis. Indeed, this was the third consecutive quarter in which Allstate's bodily injury and property damage frequency

(reported to investors on a quarterly basis) had increased.  *See* Chart on p. 16, showing

increasing bodily injury claims frequency.

> **C.    Defendants Admit Growth Fueled by Relaxed Underwriting Standards**
> **Proximately Caused the Increase in Claims Frequency and that Allstate Will**
> **Tighten Its "Underwriting Parameters"**

105.    Importantly, the August 2015 Press Release quoted Wilson as admitting, for the

first time, that "***recent growth in Allstate brand auto policies in force did increase [in]***

***frequency* . . . .**" It also quoted Wilson as stating that ***Allstate had responded with "tighter***

***underwriting standards***."  This was a key admission that its prior, greatly reduced underwriting

standards were causing the increase in claims frequency.

106.    Defendants held an earnings call the next day, August 4, 2015 (the "August 2015

Earnings Call"). Directly contradicting Defendants' Relevant Period claims that they saw

nothing to indicate that the increase in claims frequency was a quality of business issue or the

result of anything other than external factors, Winter admitted that new business growth

(achieved by greatly reducing Allstate's underwriting standards) contributed "to the higher

frequency we are seeing." Shockingly, he further admitted that this impact "was expected."

107.    Winter did not explain why this "expected" cause of the increase in claim

frequency had not been disclosed to investors earlier.  However, he did say that in response to

the increase in claims frequency, "***we are in fact tightening some of our underwriting***

***parameters***."

> **D.    Allstate Stock Price Dropped Ten Percent in a Single Day**

108.    That day, the remainder of the artificial inflation came out of Allstate's stock

price, as it plummeted ***more than 10%*** on unusually high trading volume of over 13 million

shares. This was a company-specific decline as that same day, the Standard & Poor's 500

securities index declined just 0.2% and the Standard & Poor's 500 Property & Casualty Index declined just 1.9%.

### E. After the August 3 Disclosure, Analysts No Longer Believed Defendants "External Factors" Explanation for the Spike in Its Claims Frequencies

109.    With these admissions, analysts recognized that the increase in claims frequency was not attributable to a collection of one-time, external events, but was the expected negative result of Defendants' strategy to aggressively grow Allstate's insurance business by lowering the Company's underwriting standards. For example, on August 3, 2015, analysts from UBS noted that the "[c]ontinued increase in frequency is troubling." UBS expressed doubt as to the amount by which external factors contributed to the increase in claims frequency, since competitors were not facing the same level of adverse results, and reported that since "other major personal auto carriers have not reported the same magnitude of increases in frequency, the persistent increase in frequency is a concern."

110.    Also on August 3, 2015, analysts from Wells Fargo explained that the EPS shortfall was caused in substantial part by the "continued elevated auto claims frequency," and that the negative frequency trend "appears set to linger longer than anticipated." The analysts stated that they expected Allstate "shares to trade down following the Q2 earnings release on continued high auto claims frequency."

111.    The same day, analysts from Deutsche Bank explained that "the EPS miss all comes from underlying weakness" due to frequency increases. The analysts warned that "[t]he magnitude of this pace of loss acceleration seems severe." The Deutsche Bank analysts further stated, "Strangely, Allstate's woes did not appear in competitor accident-year loss ratios for Q215" and noted that the results "could suggest some operational control problems as the company has quickly added customers." The analysts pointed out that management had

dismissed the increase in claims frequency in Q4 2014 and Q1 2015, but the continued impact "suggest[s] that a much more negative overall trend was afoot." The analysts also noted that "[t]his spike in claims trend is the sharpest in five years."

## VII.   POST-RELEVANT PERIOD DEVELOPMENTS

112.    On August 7, 2015, Deutsche Bank reported that "no peers are reporting trends that corroborate Allstate's view of auto accident frequency."

113.    On August 14, 2015, analysts from Barclays cut their price target for Allstate. The analysts stated that the "Q2 results reflect weak . . . underwriting results particularly in auto insurance in what now looks like an issue that will likely take at least several quarters to fix."

114.    On October 16, 2015, analysts from William Blair noted that Allstate's "auto underwriting margins have been deteriorating for two years. ***This negative trend appears to be due to the onset of aggressive underwriting*** in concert with a worsening macro environment." The analysts noted that "Allstate appears to have gotten aggressive from a risk perspective just as loss trends began to move up," and that "Allstate is attempting to repair its underwriting issues in a deteriorating market." The analysts also observed that "Allstate has seen a larger uptick in frequency in recent quarters than most auto insurers likely due to a combination of aggressive pricing, poor risk selection [*i.e.*, loose underwriting standards], and a push for higher growth in certain states." They explained that because the "level of deterioration" in the auto business was so significant, "[t]he company may need two underwriting cycles to completely cull the bad business."

115.    On November 2, 2015, analysts from Gordon Haskett Research Advisors noted that Allstate would be reporting its Q3 2015 results. The analysts noted that this "represents an opportunity for [Allstate] to reverse a stink that has been with the company since it reported disappointing Q2 results in August."

116.     Later that day, Allstate issued a press release reporting the Company's Q3 2015 financial results, which featured a continued increase in claims frequency. The release stated that Allstate had "made underwriting guideline adjustments in all three underwriting brands [Allstate, Esurance and Encompass] in geographic areas and customer segments experiencing less than acceptable returns."

117.     On the November 3, 2015 earnings call, Wilson reiterated that Allstate's new business had higher loss ratios and that to correct the frequency increases Allstate "made underwriting standards more restrictive which has the effect of reducing the higher loss ratio new business. As a result, Allstate brand auto policy growth declined to 3.1% with larger reductions at Esurance and Encompass." Moreover, contrary to Defendants' Relevant Period statements that the increased claims frequency was solely caused by external factors and non-recurring circumstances, Winter acknowledged that the increase was proximately caused by new business growth (which was fueled by Allstate greatly reducing it underwriting standards) and was a recurring issue that would take months to resolve, conceding "***we are assuming the trend line continues to go up at its current levels***" and "***we continue to operate as if the frequency will continue***."

118.     During an earnings call on December 9, 2015, Defendant Wilson noted that the Company had "***experienced a divergence from the very favorable auto frequency starting in the fourth quarter of 2014. That trend continued through the first three quarters of 2015 . . . and it's now at the highest level since 2003***." Wilson said Allstate was tightening underwriting and told investors that they "will see a double-digit decline in our new business in terms of – because we've tightened underwriting standards." He again confirmed Defendants' visibility into claims frequency trends by stating that "we know highly specifically how many customers will

not get through the system because we can go back and look at who came through the filter before and what we did to the new filter."

119.    During an earnings call on August 4, 2016, Wilson reiterated that Allstate had "intentionally reduced new business levels until we improve returns on capital for auto insurance," while still noting "continued increases in frequency and severity." Macellaro commented that "the results we've seen in the past 18 months have taken us back to levels not experienced since 2003 for gross frequency." He also acknowledged that the Company had "tightened underwriting guidelines in 2015 to reduce new business in underperforming segments and reduce the new business penalty."

120.    Consistent with Defendants' post-Relevant Period admissions, when Allstate's efforts to stunt new policy growth through tightened underwriting began to materialize, the rate of claims frequency increases declined, despite miles driven remaining consistently elevated on a year-over-year basis from Q2 2015 through Q2 2016.

## VIII.  <u>SCIENTER</u>

121.    Throughout the Relevant Period, the Individual Defendants had (A) the motive and opportunity to defraud Allstate's shareholders, as Defendant Wilson personally enriched himself by trading on inside information, and (B) had knowledge of information which contradicted the false statements recklessly made to investors during the Relevant Period.

### A.    Defendant Wilson Had the Motive and Opportunity to Commit Fraud

122.    On November 25-26, 2014, when Allstate's stock was trading at artificially inflated all-time highs of more than $67 per share, Wilson took advantage of his access to and knowledge of material, non-public information. Wilson exercised stock options that were not due to expire until 2019 and cashed out the shares for more than $33 million, significantly reducing

his stake in Allstate. Although Wilson had not sold Allstate stock in nearly 10 years, he sold stock valued at more than 28 times his annual base salary just after Allstate had suffered a reversal of favorable claims frequency trends in the third quarter of 2014 and was experiencing two consecutive months of large, *undisclosed increases* in year-over-year claims frequency in the fourth quarter proximately caused by its greatly relaxed underwriting standards. *See* Chart on p. 15. To be clear, it appears that the frequency claims increase in the third quarter of 2014 as shown in the chart on p. 15 is based on data that was not disclosed by Allstate until February 2016. Further, the frequency spike in October and November 2014 also was undisclosed at the time of Wilson's sales.

123. After disposing of approximately 675,000 shares, Wilson was left with only 113,000. Specifically, he exercised over 750,000 options with a strike price of approximately $16 when the stock was trading at then all-time highs of more than $67 per share. This sale was dramatically inconsistent with his prior trading patterns, as he last sold Allstate shares in 2005, before he became CEO.

124. Wilson's unusual stock sale did not go unnoticed. Crain's Chicago Business published an article on December 3, 2014 reporting that Wilson's options "weren't set to expire until 2019," which "raises questions as to why Wilson cashed them out now." The article noted the run up in Allstate's stock: "So far in 2014, Allstate's stock has risen 24.9 percent [in 2014], easily outpacing the 11.6 percent return of the Standard & Poor's 500 Financial Index."

125. By May 2015, Allstate had suffered three consecutive quarters of increases in claims frequency (beginning in 3Q 2014) that were continuing into Q2 2015 for a fourth consecutive quarter. Wilson was in possession of material non-public information: specifically, that the increase in claims frequency was continuing, and that the proximate cause of the trend

was Defendants' strategy to aggressively grow Allstate's insurance business by greatly reducing its underwriting standards. Under these circumstances, on May 26, 2015, Wilson exercised more stock options and sold **an additional 90,000 shares of his Allstate stock for approximately $6.2 million**.[5]

### B. Defendants Knew Information that Contradicted Their Public Statements

126. Prior to the Relevant Period, in order to execute their aggressive growth strategy for Allstate's insurance business, Defendants greatly loosened Allstate's underwriting standards; therefore, they were, at minimum, reckless with respect to their repeated public statements that the increase in claims frequency was unrelated to that decision.

127. Throughout the Relevant Period, the Individual Defendants held themselves out to investors and the market as extremely knowledgeable about Allstate's earnings performance and business operations. At all relevant times, Wilson was Allstate's CEO and Chairman of the Board and Winter was the President of APL and/or Allstate. Defendants were the persons with ultimate responsibility for directing and managing the Company's business affairs and communications to investors. In these roles, Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Allstate's non-management directors apprised of the state of the Company's business and operations.

---

[5] It appears that the options Wilson exercised in May 2015 would have expired on June 1, 2015. The existence of these expiring options further incentivized Wilson to maintain the inflation price in Allstate's stock price.

### 1. Issues Related to Underwriting and Claims Frequency Were Part of Allstate's Core Operations

128. Defendants' repeated misrepresentations about Allstate's increasing claims frequency concerned the Company's "core operations." The Individual Defendants, by virtue of their position within the Company, are assumed to have knowledge about Allstate's underwriting practices and the related rise in claims frequency starting in Q3 2014.

129. A core operation concerns a company's primary products or services, and extends to matters of importance that might significantly impact the company's bottom line. There is no question that Allstate brand auto insurance was Allstate's most important product. Auto insurance was Allstate's largest business segment, and the Allstate brand accounted for 90% of all auto insurance the Company sold. How frequently Allstate's customers filed claims against their insurance policies was a key measure of the Company's operations because it directly impacted the Company's profitability and determined whether the Company should raise its rates or adopt different underwriting standards.

130. A critical process used by insurance companies to evaluate the performance of their business and estimate future claims so that they can adjust underwriting standards and/or rates on a timely basis is to monitor whether claims frequency is increasing or decreasing. For example, if an insurance company loosens its underwriting to increase policies-in-force and revenues, it will then monitor the frequency of claims to determine if they are increasing at a faster rate, which may be a sign that the new business is too risky and may result in lower overall profitability.

131. Allstate not only monitored claims frequency on a daily or even hourly basis, but carefully analyzed the source of any increase, because they can have a significant impact on the

Company's financial condition and business strategy. This was especially true with respect to auto insurance, Allstate's largest business segment.

### 2. Defendants Closely Monitored Underwriting and Claim Frequency and Therefore Knew of the Increasing Frequency and Its Causes

132.    As a result of their close monitoring of claims frequency, on the February 2015 Earnings Call Defendant Wilson ***admitted*** that when Allstate learned of the trend in October 2014, Defendant Winter had "***spent untold number of hours over the last three months since we saw a tick-up in October***," adding, "***So we were on this early***."

133.    Additionally, throughout the Relevant Period and beyond, Defendants repeatedly, publicly touted their ability to monitor claims frequency on a daily and even hourly basis, as well as their ability to identify trends and the causes of trends in claims frequency. For example:

(a)    During the February 2015 Earnings Call, when analysts questioned Defendants about claims frequency, Defendant Wilson said that Defendant Winter "has been waiting anxiously for your question, because he's spent [an] ***untold number of hours over the last really three months since we saw a tick-up in October***."

(b)    On that same call, an analyst asked, "[O]n the frequency issue, you said that the frequency recovered in December. Was that also the case in January?" Defendant Winter began his response by saying, "We just closed the month. ***Let's just say that obviously we were looking at it on***…," then CFO Shebik interrupted and said "***an hourly basis***." Winter reassured analysts that January was looking good, stating: "***You know, we get claim counts daily. So let's just say we looked at it***."

(c)    On the May 2015 Earnings Call, Macellaro assured investors that Defendants were closely monitoring the increase in claims frequency, stating that "we've continued to dig into the drivers of increased frequency since the trends began to emerge in the

- 41 -

fourth quarter of last year," and that "*[w]e leverage our data and analytic capabilities to continuously analyze our business* from the macro level down to the micro segments that our local teams use to underwrite and price."

(d)     During the August 2015 Earnings Call, when analysts asked questions regarding how quickly Allstate responds to changes in claims frequency, Wilson responded that "when we're closing July right now we know exactly how many claims we had in July."

(e)     During the November 3, 2015 Earnings Call, an analyst asked whether the increased frequency in Q3 2015 was "generally within your expectations." Defendant Winter responded: "I don't think there was anything that caught us off guard. . . . [I]t certainly didn't shock us or look to be a spike that was totally unexpected" because, as Wilson stated, "we have great visibility and transparency" into frequency.

134.    After the Relevant Period, Defendants made additional admissions that further corroborate that Allstate's new business (fueled by its greatly reduced underwriting standards) was a substantial, known and expected cause of the increased frequency of claims.

135.    On September 17, 2015, Wilson and Macellaro participated in a Barclays Global Financial Services Conference. In response to an analyst's question, Wilson acknowledged that new business contributed to the increase in claims frequency, admitting that they "knew about it."[6]

136.    In terms of corrective actions, Wilson reiterated that they "will slow growth" and that "there are underwriting standards and things that you ask . . . your agencies to do[,] stuff that weed[s] people out from the customers that you will take," adding that "we've put [in] a bunch

---

[6] The slide presentation accompanying Wilson's remarks also stated that new auto growth "negatively impacted loss results," which was "in line with [management's] expectations."

- 42 -

of new underwriting standards, and that will probably cost us" in growth. Later, Wilson

conceded the new business growth came through riskier low margin business, stating "you could

obviously improve your combined ratio by just shutting down new business and getting rid of the

customers you're losing money on."

## IX. MATERIALITY

137.    Personal lines insurance in general is a low-margin business. Accordingly, small

variations in underwriting margin are very important, and closely monitored by Allstate and its

investors. For example, Allstate's most profitable brand of auto insurance, which accounted for

21.3 % percent of all of Allstate's total stated income from operations for 2014, typically had

underwriting margins of only about five percent.[7] Thus, a decrease of just one percent of overall

underwriting margin would translate to a twenty percent decrease in operating income for that

product. As Defendant Wilson himself has explained, personal lines insurance is "a relatively

low margin business . . . it's not like a software business, where you lose 5 points of margin and

you don't really care that much. We care a lot, because it's sort of like everything." Despite

Allstate's tight underwriting margins, historically the profitability of the Company's auto

insurance segment was remarkably stable, and from 2008 through 2012 it maintained margins of

five percent or better in all but two quarters.

138.    In Q4 2014, the increase in bodily injury claims caused the combined ratio for

Allstate brand auto insurance to skyrocket to 98.2, which was 2.3 points above Q4 2013 and 5.3

points above the prior quarter. This translated into substantial drops in underwriting income for

Allstate brand auto insurance as measured both year-over-year and sequentially. Underwriting

---

[7] At the start of the Relevant Period, the trailing 12-month-average underwriting margin for
Allstate branded auto insurance was 5.7 percent.

income for the segment of $196 million in Q4 2013, and $300 million in Q3 2014, dropped to just $133 million in Q4 2014, decreases of 32.1% and 55.7% respectively. These were significant declines by any measure: the smaller year-over-year drop of $63 million in underwriting income from Q4 2013 to Q4 2014 still represented 8.5% of Allstate's $740 million underwriting income for the entire Allstate Protection business segment for Q4 2014, and the $63 million drop was 5.1% of Allstate's $1,240 million company-wide income from operations for Q4 2014.

139. Allstate's poor performance, due in significant part to claims frequency, continued into Q1 2015, and underwriting income remained depressed from historical levels at $144 million. Year-over-year this represented a 47.8% drop in underwriting income.

140. In Q2 2015, due in large part to the continuing increased claims frequency in the Allstate brand auto segment, Allstate experienced an underwriting loss of $62 million, off $259 million from Q2 2014 and $206 million from the prior quarter. Going back to 2008, Allstate had experienced a loss in this segment in only one other quarter, Q4 2012, when Hurricane Sandy wreaked havoc. But even in that quarter, Allstate did not experience as large a loss as the Company experienced in Q2 2015.

141. Moreover, the following additional facts establish that Defendants' misstatements were material, and had Defendants been truthful, the facts disclosed would have significantly altered the total mix of information in the market place.

(a) First, the continuation of the increase in claims frequency into October 2014 indicated that the sharp reversal of favorable claims frequency trends from Q2 to Q3 2014 was not an aberration and was continuing.

(b) Second, the increase in claims frequency in October 2014 followed just after the rate of change of bodily injury paid claims frequency jumped 4.0 percentage points

from a favorable negative rate in Q2 2014 to an unfavorable positive rate in Q3 2014. A four

point spike in one quarter was highly unusual, as a swing that size had not occurred since 2010.

Such an unusually large spike, that reversed Allstate's claims frequency trend from a favorable

one to an unfavorable one, was highly material.

(c)     Third, Allstate management reacted strongly and swiftly to the increase in

claims frequency in October 2014.  For example, on the February 2015 Earnings Call, Defendant

Wilson admitted that when they learned of the trend in October 2014, Defendant Winter had

"*spent untold number of hours over the last really three months since we saw a tick-up in*

*October*," adding, "*So we were on this early*."

(d)     Fourth, in Q4 2014, bodily injury claims frequency increased 5.3 points,

which was extremely unusual. Only one other quarter, Q2 2011, from 2010 to 2015 featured a

change of that magnitude.

(e)     Fifth, trends in increased claims frequency were discussed by Allstate

management on every earnings call that took place during the Relevant Period, and analysts

covering the Company asked questions about them on each of those calls.

(f)     Sixth, the market reacted negatively to the corrective disclosures

concerning Allstate's increased claims frequency, and causes for those increases, in February,

May and August 2015.  Indeed, on August 4, 2015 Allstate's stock price plummeted more than

10% in a single day as a result of the corrective disclosures concerning the persistence and

causes for the increase in claims frequency.

(g)     Finally, when Defendants admitted the increase in claims frequency was

related, at least in part, to Defendants' strategy to aggressively grow Allstate's insurance

- 45 -

business by loosening the Company's underwriting standards, Defendants sought to reassure the market by tightening those standards.

## X.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

142.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Plaintiff purchased Allstate common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

143.    At all relevant times, the market for Allstate shares was efficient for the following reasons, among others:

(a)    Allstate stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Allstate filed periodic public reports with the SEC and the NYSE;

(c)    Allstate regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such

as communications with the financial press, securities analysts and other similar reporting services; and

(d)     Allstate was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of those reports was publically available and entered the public marketplace.

144.     As a result of the foregoing, the market for Allstate common stock promptly digested current information regarding Allstate from publicly available sources and reflected such information in Allstate's stock price. Under these circumstances, Plaintiff during the Relevant Period suffered injury through its purchases of common stock at artificially inflated prices and a presumption of reliance applies.

145.     Plaintiff is also entitled to a presumption of reliance under the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), and its progeny, as Defendants misstatements throughout the Relevant Period were primarily ones of omission, in that they failed to inform investors that the proximate cause of Allstate's dramatic increases in its claims frequency was its use of greatly reduced underwriting standards.

## XI.     CAUSES OF ACTION

### COUNT I

#### For Violation of §10(b) of the Exchange Act and Rule 10b-5
#### Against All Defendants

146.     Plaintiff incorporates ¶¶1-151 by reference.

147.     During the Relevant Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

148.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Allstate common stock during the Relevant Period.

149.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for Allstate common stock. Plaintiff would not have purchased Allstate common stock at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against Defendants Wilson and Winter**

150.     Plaintiff incorporates ¶¶1-155 by reference.

151.     Wilson and Winter acted as controlling persons of Allstate within the meaning of §20(a) of the Exchange Act. By virtue of their positions with the Company, ownership of Allstate stock, and participation in and/or awareness of the Company's operations and finances, Wilson and Winter had the power and authority to cause Allstate to engage in the wrongful conduct complained of herein.

152.    Wilson and Winter were both provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

153.    Wilson and Winter had direct and supervisory involvement in the day-to-day operations of the Company and regularly spoke on behalf of the Company. They exercised control over the operations of Allstate and had the power to control the public statements about Allstate giving rise to the securities violations as alleged herein, and exercised the same.

154.    Allstate violated §10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Wilson and Winter are liable pursuant to §20(a) of the Exchange Act for Allstate's violations of §10(b). As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchases of the Company's stock during the Relevant Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Awarding Plaintiff damages in an amount to be proven at trial, including interest;

B.    Awarding Plaintiff's reasonable costs and attorneys' fees; and

C.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 6, 2018

**POMERANTZ LLP**

By: ___/s/ Louis Carey Ludwig___
Louis Carey Ludwig
10 S. LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email:    lcludwig@pomlaw.com

Liaison Counsel

**LABATON SUCHAROW LLP**

Thomas A. Dubbs (pro hac vice)
Thomas G. Hoffman (pro hac vice)
140 Broadway
New York, NY 10005
Telephone: (212)907-0700
Facsimile: (212)818-0477
Email:    tdubbs@labaton.com
          thoffman@labaton.com

Attorneys for Plaintiff